IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

TEVIN AKEEM NETTLES,
      Petitioner,

vs.                          Case No.: 3:17cv337/LAC/EMT

JULIE JONES,
      Respondent.
_____/

## **REPORT AND RECOMMENDATION**

Petitioner filed a petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 1).  Respondent filed a motion to dismiss the petition as untimely, with portions of the state court record (ECF No. 26).  The court provided Petitioner an opportunity to respond to the motion (*see* ECF No. 27), but he has not done so.

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b). After careful consideration of all issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Respondent's motion to dismiss should be granted.

I.      BACKGROUND AND PROCEDURAL HISTORY

The procedural background of this case is established by the state court record (ECF No. 26).[1]  Petitioner was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2011-CF-2369, with one count of carjacking with a firearm or deadly weapon (Count 1), one count of armed robbery with a firearm (Count 2), and one count of armed kidnapping with a weapon (Ex. A at 1).  Following a trial on September 30, 2011 (Ex. C), the jury returned a verdict of guilty as charged on all counts, but with a specific finding, with respect to the carjacking and robbery counts, that Petitioner did not actually possess a firearm (Ex. D).  Sentencing hearings were conducted on November 3, 2011, and on January 19, 2012, at the conclusion of which the court adjudicated Petitioner guilty and sentenced him to concurrent terms of fifteen (15) years in prison, followed by concurrent terms of five (5) years of probation (Ex. A at 19–39, 53–60, 78–96).

Petitioner appealed the judgment to the Florida First District Court of Appeal ("First DCA"), Case No. 1D12-786 (Ex. E).  On May 17, 2013, the First DCA issued the following opinion:

---

[1] Hereinafter all citations to the state court record refer to the electronically filed exhibits to Respondent's motion to dismiss (ECF No. 26) unless otherwise indicated.  Additionally, if a cited page has more than one page number, the court cites to the "Bates stamp" page number.

Tevin Akeem Nettles appeals his convictions and sentences for carjacking with a firearm and robbery with a firearm arguing the jury's verdict was legally inconsistent.  We agree and reverse and remand for resentencing.

By information Nettles was charged with carjacking with a firearm or a deadly weapon, robbery armed with a firearm, and armed kidnapping with a weapon.  At trial, the jury was not instructed on the principals theory, and the verdict used did not list any lesser included offenses.  In addition to asking the jury to find Nettles guilty or not guilty as to each charged offense, the jury was asked to find whether or not Nettles possessed a firearm during the carjacking and during the robbery.  The jury found Nettles guilty as charged with respect to each of the three offenses, but found that he did not possess a firearm with respect to the charges of carjacking with a firearm and robbery with a firearm.  Nettles thereafter moved to be adjudicated guilty of carjacking and robbery, but the trial court denied that motion.  Nettles was then adjudicated guilty of carjacking with a firearm and robbery with a firearm, first degree felonies punishable by life.

A verdict which is factually inconsistent is permissible in Florida as it results from a jury's inherent authority to acquit.  Thus, for example, a jury's verdict finding a defendant guilty of aggravated fleeing and eluding and attempted assault charges is permissible even though such a result is factually inconsistent with a verdict of not guilty by reason of insanity on other charges arising from the same incident. *State v. Cappalo*, 932 So. 2d 331 (Fla. 2d DCA 2006).

A verdict which is legally inconsistent, however, cannot stand. *See Shavers v. State*, 86 So. 3d 1218 (Fla. 2d DCA 2012).  Such a verdict occurs when a "not-guilty finding on one count negates an element on another count that is necessary for conviction." *Id.* at 1221. Here, the jury's finding that Nettles did not possess a firearm negated the possession element necessary for conviction of carjacking with a firearm, section 812.133(2)(a), and robbery with a firearm, section 812.13(2)(a), Florida Statutes (2011).

>       Accordingly, the trial court erred in adjudicating Nettles guilty of
> carjacking with a firearm and robbery with a firearm. We reverse the
> judgment of conviction as to these counts and vacate the sentences
> therefor. The cause is remanded for entry of a corrected judgment which
> adjudicates Nettles guilty of carjacking and robbery; the third conviction
> is unaffected by this decision. Upon preparation of a corrected Criminal
> Punishment Code scoresheet, Nettles is to be resentenced.

Nettles v. State, 112 So. 3d 782, 782–83 (Fla. 1st DCA 2013). The mandate issued

June 4, 2013 (Ex. I).

On July 19, 2013, the trial court rendered a new judgment adjudicating

Petitioner guilty of carjacking, robbery, and armed kidnapping with a weapon, and

sentencing him to concurrent terms of twelve (12) years in prison, followed by a term

of five (5) years of probation, with pre-sentence credit of 243 days (Ex. J). Petitioner

did not appeal the judgment.

On January 28, 2015, Petitioner filed a motion for post-conviction relief in the

state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal Procedure

(Ex. K). The circuit court ordered a limited evidentiary hearing on one of Petitioner's

two claims, and appointed counsel to represent Petitioner (see Ex. N). The evidentiary

hearing was held on February 11, 2016 (Ex. P). On February 16, 2016, the court

denied the Rule 3.850 motion (Ex. Q). Petitioner did not appeal the decision.

On Petitioner filed the instant § 2254 petition on May 10, 2017 (ECF No. 1).

## II.    ANALYSIS

A one-year period of limitation applies to the filing of a habeas petition by a person in custody pursuant to a state court judgment.  *See* 28 U.S.C. § 2244(d)(1). The limitation period runs from the latest of:

> (A)  the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
>
> (B)  the date on which the impediment to filing an application created by State action in violation of the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;
>
> (C)  the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
>
> (D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

28 U.S.C. § 2244(d)(1).

Respondent contends that the appropriate statutory trigger for the federal limitations period in this case is the finality date of the resentencing judgment, pursuant to § 2244(d)(1)(A) (*see* ECF No. 26 at 5–6).[2]  Petitioner's resentencing

---

[2] When referencing the parties' pleadings, the court refers to the page numbers automatically assigned by the court's electronic filing system, rather than those of the original documents.

judgment rendered on July 19, 2013, and became final on Monday, August 19, 2013, upon expiration of the 30-day period for filing a notice of appeal of the judgment. *See* Fla. R. App. P. 9.140(b)(3); *see also* Fla. R. Jud. Admin. 2.514(a)(1)(C) (if the last day of the period is a Saturday, Sunday, or legal holiday, the period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday).  If the finality date is the appropriate statutory trigger for the federal limitations period, the limitations period began to run on August 20, 2013, the day after the 30-day period for Petitioner to file an appeal expired.[3]

Petitioner does not argue that a different trigger applies; instead, he contends statutory tolling renders his federal petition timely (*see* ECF No. 1 at 20).  He also argues he is actually innocent of the crimes (*id.*).

Even though Petitioner does not argue for a different statutory trigger, the court notes that two of Petitioner's four grounds for relief relate to an alleged recantation by the victim, Christopher Selbo (*see* ECF No. 1 at 5, 8, 15–18).  Petitioner alleges Mr. Selbo "did not come forward until July 7, 2013" (*id.* at 5).  Petitioner attached two written statements from Mr. Selbo, one of which is dated January 18, 2012 (according

---

[3] Federal Rule of Civil Procedure 6(a) provides that "[i]n computing any period of time prescribed or allowed by . . . any applicable statute, the day of the act, event or default from which the designated period of time begins to run shall not be included."  Fed. R. Civ. P. 6(a); *see also* Washington v. United States, 243 F.3d 1299, 1301 (11th Cir. 2001) (Rule 6 applies to calculation of one-year statute of limitations under AEDPA).

to the notary's stamp), and the other is dated July 7, 2013 (*see id.* at 17, 18). Both of those dates are <u>prior to</u> August 19, 2013, the finality date of Petitioner's criminal judgment. Since § 2244(d)(1) sets the limitation period as running from the <u>latest of</u> the dates described therein, Petitioner has not shown that a trigger other than the "finality date" trigger applies. Applying that trigger, the federal statute of limitations began to run on August 20, 2013, and Petitioner had one year from that date, or until August 20, 2014, to file his § 2254 petition. *See* <u>Downs v. McNeil</u>, 520 F.3d 1311, 1318 (11th Cir. 2008) (limitations period should be calculated according to "anniversary method," under which limitations period expires on anniversary of date it began to run) (citing <u>Ferreira v. Dep't of Corr.</u>, 494 F.3d 1286, 1289 n.1 (11th Cir. 2007)).

The time during which a properly filed application for state post-conviction or other collateral review is pending is not counted toward the one-year federal limitations period. *See* 28 U.S.C. § 2244(d)(2). Petitioner did not file any applications for state post-conviction relief prior to August 20, 2014; therefore, he is

not entitled to statutory tolling.[4]  Petitioner's § 2254 petition, which he filed on May 10, 2017, is thus untimely.

Petitioner contends he is entitled to review of his § 2254 petition under the "miscarriage of justice" exception to the procedural bar because he is actually innocent of the offenses for which he was convicted.  In McQuiggin v. Perkins, 569 U.S. 383, 133 S. Ct. 1924, 185 L. Ed. 2d 1019 (2013), the Supreme Court recognized that actual innocence, if proved, serves as a gateway through which a petitioner may pass to obtain federal habeas review.  569 U.S. at 386.  The Court cautioned that "tenable actual-innocence gateway pleas are rare:  '[A] petitioner does not meet the threshold requirement unless he persuades the district court that, in light of [ ] new evidence, no juror, acting reasonably, would have voted to find him guilty beyond a reasonable doubt.'"  Id. (quoting Schlup v. Delo, 513 U.S. 298, 329, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995) and citing House v. Bell, 547 U.S. 518, 538, 126 S. Ct. 2064, 165 L. Ed. 2d 1 (2006)).

The Supreme Court stated in Schlup:

---

[4] Petitioner filed his Rule 3.850 motion on January 28, 2015, which was after the federal limitations period expired.  Therefore, it did not qualify for statutory tolling.  See Hutchinson v. Florida, 677 F.3d 1097, 1098 (11th Cir. 2012) (in order for §2244(d)(2) statutory tolling to apply, the petitioner must file state collateral petition before the one-year period for filing federal habeas petition has run); Webster v. Moore, 199 F.3d 1256, 1259 (11th Cir. 2000)("A state-court petition . . . that is filed following the expiration of the limitations period cannot toll that period because there is no remaining period to be tolled.").

> [A] substantial claim that constitutional error has caused the conviction
> of an innocent person is extremely rare.  To be credible, such a claim
> requires [a] petitioner to support his allegations of constitutional error
> with new reliable evidence—whether it be exculpatory scientific
> evidence, trustworthy eyewitness accounts, or critical physical
> evidence—that was not presented at trial.

513 U.S. at 327.

In House, the Court emphasized several features of the Schlup standard.  First, when considering an actual innocence claim in the context of a request for an evidentiary hearing, "the district court need not test the new evidence by a standard appropriate for deciding a motion for summary judgment, but rather may consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of that evidence."  547 U.S. at 537 (internal quotation marks and citation omitted).  When considering an actual innocence claim on a fully developed record, the habeas court must consider "all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."  *Id.* at 538 (internal quotation marks and citations omitted).  Based on this total record, the court must make "a probabilistic determination about what reasonable, properly instructed jurors would do."  *Id.* (internal quotation marks and citations omitted).  "The court's function is not to make

an independent factual determination about what likely occurred, but rather to assess the likely impact of the evidence on reasonable jurors." *Id.* (citation omitted).

Second, the <u>Schlup</u> standard is demanding and permits review "only in the extraordinary case." <u>House</u>, 547 U.S. at 538 (internal quotation marks and citations omitted). At the same time, though:

> [T]he <u>Schlup</u> standard does not require absolute certainty about the petitioner's guilt or innocence. A petitioner's burden at the gateway stage is to demonstrate that more likely than not, in light of the new evidence, no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt.

<u>House</u>, 547 U.S. at 538.

Finally, because an actual innocence claim involves evidence that the jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record. *See* <u>House</u>, 547 U.S. at 538.

Because Petitioner's actual innocence claim is based upon the alleged recantation of the victim, Christopher Selbo, the court will begin by reviewing Mr. Selbo's trial testimony. Petitioner's trial was held on September 30, 2011 (Ex. C). Mr. Selbo testified that on May 22, 2011 (just four months prior to his testimony), he arranged to meet a man who referred to himself as "Screw" at the Home Depot store

on the corner of Nine Mile Road and Untreiner Avenue (Ex. C at 29–30).  Mr. Selbo

identified co-defendant Otis Foster as "Screw" (*id.* at 30).  Selbo testified he and

Foster were going to meet, because Foster was going to sell him "some roxy" (*id.* at

31).  Mr. Selbo testified that when he arrived at Home Depot, Foster was in a car with

two other men (*id.* at 31, 35).  Selbo testified that one of the other men was someone

he knew as "Coon," a man he later learned was Andre Cook (*id.* at 31–32).  Selbo

testified that Petitioner was the third man, and that he was the man with the gun (*id.*

at 32).  Selbo testified that Foster did not get out of the car (*id.* at 31–32).  He testified

that Petitioner was the first man who made contact with him (*id.* at 32).  Mr. Selbo

testified that Petitioner got out of Foster's car, hopped in the passenger side of Selbo's

truck, and asked Selbo how many he was trying to get (*id.* at 32, 34, 35, 54).  Selbo

testified he told Petitioner "around seven or eight," and Petitioner said it would cost

$200 (*id.* at 32, 54).  Selbo testified that he and Foster had previously agreed that the

cost would be only $50 (*id.* at 32–33).  Mr. Selbo testified he glanced in his driver's

side mirror and saw Cook running beside the truck on the driver's side (*id.* at 33–34).

Selbo testified that Cook entered the truck on the driver's side (*id.* at 34).  Selbo

testified that he looked in Petitioner's direction and saw Petitioner holding a black

handgun (*id.*).  Selbo testified that Petitioner grabbed him by the hair, yelled at him

to be quiet, and stated that he was not scared to shoot Selbo (*id.* at 34–35).  Selbo

testified that Cook drove the truck away from Home Depot and down Untreiner

Avenue (*id.* at 35).  Selbo testified that his head was down in the seat, and Petitioner

was holding the gun at his head (*id.*).  Selbo testified that Cook stopped the truck at

a side street (*id.*).  Selbo testified that Petitioner got out of the truck and stood by the

side of the truck with the door open, and was holding the gun to Selbo's face (*id.* at

35–36).  Selbo testified that Petitioner screamed at him to be quiet and not to move

or try to look to see where he was (*id.* at 36).  Selbo testified that Cook exited the

truck and started to remove speakers from the back (*id.*).  Selbo testified he saw the

same car, which he previously saw Foster driving at Home Depot, at this new location

(*id.* at 36).  Mr. Selbo testified Foster exited the car and assisted Cook with removing

items from Selbo's truck, including the speakers, an iPod, a $50 bill, a CD player,

Selbo's phone, and Selbo's hat (*id.* at 36–37).  Selbo testified that while this was

happening, Petitioner was pointing the gun at him (*id.* at 37).  Selbo testified that after

the men robbed him, they got in the car and left (*id.*).  Selbo testified that he called the

police, and met them in the parking lot of a restaurant (*id.* at 38–39).  Selbo testified

he described the events to police, but he did not report that he originally met the men

to buy drugs (*id.* at 39).  Selbo testified he "thought I would get in trouble" if he

revealed that fact (*id.*).  Selbo testified that the police found three suspected robbers

and drove him to their location to determine if the suspects were the actual robbers (*id.*

at 40).  Selbo testified that he viewed the suspects and identified them as the robbers

(*id.*).

On cross-examination, Mr. Selbo testified that he told police that Petitioner was

wearing a purple Polo shirt during the robbery (Ex. C at 41).  Selbo testified that when

he viewed the suspects with police, Petitioner was wearing a different shirt (*id.*).

Selbo also testified that the police presented him with only three men during the

"show up" (*id.* at 43–44).  Petitioner's counsel elicited Selbo's admission that he had

never seen Petitioner before the night of the robbery (*id.* at 41).  Petitioner's counsel

also questioned Selbo about his ability to view the robber whom he identified as

Petitioner:

> Q.  And the situation you described, it seemed rather quick.  How long would you say you spoke with this person that initially got into the car with you?
>
> A.  I'd say three or four minutes.
>
> Q.  Three or four minutes, okay.  And then you say after that Mr. Cook got into the car.
>
> A.  Yes, sir.
>
> Q.  And it was at that time you saw a gun?

A.  Yes, sir.

Q.  And it was also at that time that your head was forced down?

A.  In the same—I mean, within a 30-second span, yeah.

Q.  Okay.  So we have got, like, three and a half minutes on the front end; right?  Now, you said there was some driving and the whole time your head was down; is that right?

A.   I mean, not completely facedown [sic] the whole time, sideways. I can look around and I could see in my peripheral vision.

Q.  Right.  Presumably with your head, at least in a downward position, you're not able to see up; is that right?

A.  Correct.

Q.  And you said that after the car stopped, the person with the gun was standing outside the vehicle making sure that your head stayed down essentially; right?

A.  Not necessarily.  Just my head was—make sure that I didn't move, in general.

Q.  Right.  So you weren't able to stare at the person, I would imagine; is that right?

A.  No. Actually—I mean, I looked at him quite a few times during the whole—the whole process.  Even though he told me not to, I did it—I did it anyways.

Q.  You did testify that when you would try to move your head, you were told to stop moving and I think you said you even got poked with the gun; is that correct?

A.  That's correct.

Q.  So any view of this person who supposedly had this gun would have been relatively quick, right, because he would have told you to keep your head down; right?

A.  Correct.

. . . .

Q.  Okay.  Now, just to clarify, with regard to the person that [sic] was holding the gun, would it be fair to say that after the gun comes out, everything is kind of a blur?

A.  In a sense, yes, sir.  In a way, but—

Q.  Because there's a lot of things going on; right?

A.  Yes, sir.

(Ex. C at 40–42, 46).

Deputy Timothy Hernandez testified that he was working on May 22, 2011 (Ex. C at 72).  Hernandez testified he heard, over his police radio, that possible robbery suspects were driving a small silver vehicle and were last seen driving southbound on Untreiner (*id.* at 72–74).  Hernandez testified he drove southbound onto Untreiner and began searching neighborhoods for a vehicle of that description (*id.* at 73–74).  Deputy Hernandez testified he saw three black males exiting a small silver vehicle near Amber Ridge Road (*id.* at 74).  Hernandez testified he notified another deputy in the area, and they made contact with the men (*id.* at 74–75).  Hernandez testified

that Petitioner had re-entered the silver vehicle, and two other deputies were talking to him (*id.* at 75).  Hernandez testified he saw co-defendant Foster sitting on the porch of the house (*id.* at 75–76).  Hernandez testified he saw a large speaker and an iPod-like device on the porch where Foster was sitting (*id.* at 76).

Mary Beth Bryie, a fingerprint examiner with the Florida Department of Law Enforcement ("FDLE"), testified that she examined 17 fingerprint lifts collected by law enforcement during the investigation of the case, and she was not able to identify Petitioner's fingerprints in any of them (Ex. C at 91–92).

Jennifer Hatler, a crime laboratory analyst with the FDLE's biology section, testified that law enforcement submitted a swab from a firearm for DNA testing (Ex. C at 97).  Hatler testified she produced a DNA profile from the swab, and it matched the DNA profile of co-defendant Andrew Cook (*id.*).

The trial court read a stipulation to the jury (Ex. C at 98).  The parties stipulated that Mr. Selbo's JBC CD player was recovered during the investigation of the case, and it had co-defendant Foster's fingerprints on it (*id.* at 99).  The parties also stipulated that a handgun was recovered from the backyard of the residence where Foster and Petitioner were located; that the handgun had no fingerprints on it; and that the handgun contained co-defendant Cook's DNA (*id.*).  The parties stipulated that

Mr. Selbo's cell phone was found in the backyard of the residence where Foster and Petitioner were located (*id.*).

Petitioner's actual innocence claim is based upon Mr. Selbo's alleged recantation. In support of this claim, Petitioner submitted two written statements signed by Mr. Selbo (ECF No. 1 at 17, 18). One statement, which was notarized on January 18, 2012, states the following:

> To whom it may concern. I Christopher Selbo feel like I was pressured to give my statement. We was [sic] in a situation and my adrenaline was rushing and vision was blurry. I was under the influence of drugs and I received treatment for it. And now I'm a better man. I've change [sic] my life and I'm hoping to right my wrong.

(ECF No. 1 at 17).

The second statement, dated July 7, 2013, states the following:

> To whom it may concern,
>
> I Christopher Selbo am stating that Tevin Akeem Nettles did not rob nor steal any of my possessions. There was three black males involved in the robbery and after having the time to think about it, I don't believe Tevin Nettles was the gun man.
>
> At the time in court while I was testifying I was very nervous and felt pressured since I have never been in that type of situation before.
>
> Since that day I have came [sic] a long way as a person and I'm constantly trying to better myself. With that being said I don't want to live with a guilty conscious [sic] over uncertainty.

Sorry for any trouble or inconvenience.

(ECF No. 1 at 18).

Two factors bear on the probable reliability of Mr. Selbo's alleged written recantations.  First, although both statements are signed and notarized, neither of them is sworn or signed under penalty of perjury (*see* ECF No. 1 at 17, 18).  Second, and more significantly, the state post-conviction court fully developed the record with respect to Petitioner's actual innocence claim by holding an evidentiary hearing on February 11, 2016 (*see* Ex. P).  Mr. Selbo testified at the evidentiary hearing, and his written statement of July 7, 2013, was admitted into evidence (*id.* at 4–15).

At the evidentiary hearing, Petitioner's post-conviction counsel asked Mr. Selbo if Petitioner robbed him on May 22, 2011 (Ex. P at 5).  Mr. Selbo responded, "I'm not sure." (*id.*).  Counsel asked Mr. Selbo if Petitioner stole anything from him on that date (*id.*).  Mr. Selbo responded, "I can't remember." (*id.*).  Counsel asked Mr. Selbo if Petitioner carried a firearm when he was robbed (*id.*).  Mr. Selbo responded, "Whoever did it." (*id.*).  Counsel continued:

> Q.  Okay.  But your testimony is that it wasn't Tevin Nettles, or—
>
> A.  I—
>
> Q.  What's your testimony?

A. I don't—I can't say it wasn't him.

Q.  Seems like you're a little bit nervous this morning; is that right?

A. Little bit, yes, sir.

Q. Okay.  Were you nervous when you testified at the trial back in 2012 [sic]?

A. That's fair to say.

Q. Is that a yes?

A. Yes, sir.

Q.  And did you feel pressured at that time to testify that Mr. Nettles was in fact the gunman?

A. No, sir.  Not at all.

Q. Okay.  So when it comes to your testimony today, is it your testimony that you cannot be certain that Mr. Nettles was the gunman?

A. Yes, sir.

(Ex. P at 5–6).

On cross-examination by the State, Mr. Selbo testified as follows:

Q.  I'm going to show you a document dated July 7, 2014 [sic] that's attached to Mr. Nettles' petition in this matter; do you recognize that?

A.  Yes, sir.

Q. Okay. And when you testified at trial, did you testify truthfully?

A. Yes, sir.

Q. Okay. Is that your signature on the bottom of that piece of paper?

A. Yes, sir.

Q. Okay. And did you voluntarily sign that? Well, let me rephrase the question.

What were the circumstances that this document was created and your signature was placed upon it?

A. It was at one of Mr. Nettles' relative's house and it was notarized by one of his family members, if that tells you anything.

Q. Okay. Well, what were you doing over there?

A. I was trying to please people and to get left alone about everything.

Q. Okay. Have you been threatened or harassed as a result of your testimony in the trial?

A. No, sir.

Q. Well, what were you trying to get peace from then?

A. I mean, as far as—I mean, nobody—I was tired of everybody asking me about this, asking me about that, asking me to do this, asking me to do that. And so, I wanted to be gone on it, and if this is what would have gotten it to disappear from my life, that's what I wanted.

Q.  Okay.  Who—somebody's been harassing you about this?

A.  I wouldn't say harassing, but asking me.

Q.  Well, they threatened you?

A.  No, sir.

Q.  Did—I thought you told me somebody was holding a knife at you when you signed that document, in front of you.

A.  No, sir.  No, sir.  You must have misunderstood me.

Q.  Okay.  Would they have allowed you to leave before you signed that if you hadn't signed that?

A.  I believe so, yes, sir.  It wasn't—I mean, it would have been a fiasco probably, but I don't think they would have killed me or anything.  No, sir.

Q.  Well, what do you mean by a fiasco?

A.  I mean, it would have been—I would have had to explain why I didn't want to do it.  I don't feel like I would have lost my life if I would have left that day, but I would have had to do something—discussing about why I didn't want to.  It wouldn't have been just, Oh, I don't want to do it, and just walk out and them be cool with it.

Q.  Okay.  Well, is what's in that paper there in front of you true?

A.  Not completely.

Q.  Okay.  What's not true?

A.  I—I can't be sure that it wasn't him.

Q.  Well, you—when you testified at trial, you were sure it was him, weren't you?

A.  I can't remember.

Q.  Okay.  So whatever's in the record, then you'll say that that—if it's typewritten in the record as part of his trial it will be true, would it not?

A. I would—I would assume so, because my memory was clearer back then, because it was closer to whatever event happened happened [sic].

Q.  All right.  And you didn't voluntarily sign that piece of paper that's in front of you, did you?

A.  I mean, like I wasn't—wasn't held at gunpoint.  I wasn't ever threatened violence, but it was—it was brought up multiple times and I just wanted it to stop being brought up, you know.

Q.  So you just signed to get these people off your back then?

A.  Pretty much, yes, sir.

(Ex. P at 6–9).

On re-direct examination, Mr. Selbo testified that he wrote and signed the July 7, 2013 statement, but that someone suggested to him what to write (Ex. P at 10–11). Mr. Selbo testified that the person was a man, a couple of years older than him (*id.* at 11).  Petitioner's counsel asked Mr. Selbo to describe how the statement came about, and Selbo responded:

A.  Well, I had people that I were—was kind of— wouldn't say best friends with.  Whenever I seen [sic] them out we would say hey. We were, you know, pretty—were, like, associates that were mutual friends with, I guess, him and his people.  And they—they were also a part of the just—the group of people trying to just get me to, you know, write whatever I had to write to help him out, to get everything over with.  And since I was tired of being bothered with it I just agreed to do it.

Q.  And so when you say "write what you needed to write to get him out", do you mean create some document that would—that would recant your prior statement that would—in an effort to overturn his conviction?

A.  Yes, sir.

Q.  Okay.  Now, then, after—well, first of all, did anybody make you sign this piece of paper after you drafted it?

A.  Physically, no, sir.

Q.  Okay.  And you know there was some testimony about you feeling pressured, that you—that you could leave, but there might be trouble; what kind of trouble are you talking about? Are you talking about they would keep calling you to come back, or they would prevent you from leaving, or what kind of trouble do you mean?

A.  Well, I know they would keep calling me.  The issue wouldn't have went [sic] away.  I can't say they would have prevented me from leaving because, I mean, I had a cell phone, I could have called the cops or something like that.

Q.  Yeah.  Were you worried to that extent that they wouldn't have let you leave?  Do you understand my question?
. . . .

A.  I feel like—I mean, it could have been a—a possibility.

Q.  Okay.  Now, was that among the considerations when you drafted and signed this document, or was that not really a factor?

A.  Like I said, I just wanted everybody to get off my back.  That's when I drafted and signed the document.

Q.  And "off your back", by "off your back—"

A.  Just leaving me alone and stop contacting me and my family.

(Ex. P at 11–13).

At the conclusion of the hearing, the state court made factual findings with

respect to the evidence:

THE COURT:  All right.  Mr. Selbo has indicated that his—I don't find that he has recanted. . . . .

I don't find that anything in this document effectively recants what his trial testimony was, especially in light of weighing and evaluating his credibility as a witness.  It's clear, based upon his testimony, he didn't do this truly of his own free will.  He was trying to please people.  He wanted people to leave him alone.  He was tired of people asking him, wanted this to disappear from his life.
. . . .
I do find that any written words in that document are not credible and were not of his own free will.

And I do find that there—this is not a clear recantation.  I don't find this witness to be credible, and I think his testimony supports the fact that his trial testimony should stand.  He even stated his memory was clearer back then.
. . .

I will note there are multiple witnesses in the courtroom, and Mr. Selbo's demeanor was clearly such that he felt intimidated. He—he was extremely reluctant to even look at the back of the courtroom where these witnesses are located.

Now, none of us here know if those witnesses are involved or not, but clearly there is a history between what was—trying to remember his words about these mutual associates of these groups of people. So whatever's going on outside of the courthouse needs to stop before somebody gets hurt.

(Ex. P at 18–20). The state court reduced its oral findings to a written order, which

included the following with respect to Petitioner's "newly discovered evidence" claim

based upon Mr. Selbo's alleged recantation:

In the written recantation attached to Defendant's motion, Mr. Selbo wrote that Defendant did not rob or steal from him and was not the man who threatened him with a gun. He added that he was "very nervous" when he testified at Defendant's trial and "felt pressured since I have never been in that type of situation before."

At the evidentiary hearing, the State asked Mr. Selbo about the circumstances surrounding his written recantation. Mr. Selbo said that he had written the recantation at the home of one of Defendant's relatives and that it was "notarized by one of his family members." Mr. Selbo explained that he signed the recantation because he was "trying to please people and to get left alone about everything." Mr. Selbo testified that he had been repeatedly contacted about the case by various people connected with Mr. Nettles and that he "wanted everybody to get off my back." Although he denied being physically threatened, Mr. Selbo testified that it would have been a "fiasco" if he had refused to sign the recantation. Mr. Selbo also denied being pressured to testify at Defendant's original trial and insisted that he had testified truthfully.

> The Court finds that Mr. Selbo has not, in fact, recanted his testimony and that the written document stating Defendant had not robbed him was only signed under duress and after continued harassment. Since Mr. Selbo has not voluntarily recanted his testimony, Defendant's claim on this ground is denied.

(Ex. Q at 1–3).

Considering the evidence adduced at trial and the fully developed record on Petitioner's newly discovered evidence/actual innocence claim, the undersigned concludes that Petitioner has not proffered new reliable evidence, nor has he persuaded this court that, in light of the new evidence, it is more likely than not that no reasonable juror would find him guilty beyond a reasonable doubt—or, to remove the double negative, that more likely than not any reasonable juror would have reasonable doubt about his guilt. Petitioner's having failed to satisfy the <u>Schlup</u> standard, he is not entitled to federal review of his time-barred petition.

## III.   CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." If a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice

of appeal must still be filed, even if the court issues a certificate of appealability.  28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  <u>Buck v. Davis</u>, 580 U.S.—, 137 S. Ct. 773 (2017) (citing <u>Miller-El</u>, 537 U.S. at 327).  Here, Petitioner cannot make that showing.  Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That Respondent's motion to dismiss (ECF No. 26) be **GRANTED**.

2.    That the habeas petition (ECF No. 1) be **DISMISSED as untimely**.

3.    That a certificate of appealability be **DENIED**.

At Pensacola, Florida, this 20th day of July 2018.

/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**

## NOTICE TO THE PARTIES

**Objections to these proposed findings and recommendations must be filed within fourteen (14) days after being served a copy thereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.  A copy of objections shall be served upon all other parties.  If a party fails to object to the magistrate judge's findings or recommendations as to any particular claim or issue contained in a report and recommendation, that party waives the right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions.  *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**